**Tim LIGHTNER, Plaintiff–Respondent,**

v.

**FARMERS INSURANCE COMPANY, INC., Defendant–Appellant.**

**No. 72023.**

Supreme Court of Missouri,
En Banc.

May 15, 1990.

James Newberry, Robin Bullock, Springfield, for defendant-appellant.

F. William Joyner, Mathew W. Placzek, Springfield, for plaintiff-respondent.

RENDLEN, Judge.

While standing on a sidewalk in Springfield, plaintiff was struck and seriously injured by an automobile driven by Aaron Gaba in September 1982. Gaba's vehicle was insured by a liability policy affording only $25,000 protection and his company paid the full coverage to Tim Lightner.

Plaintiff then filed "uninsured motorist" claims against Farmers Insurance Company (Farmers) under three policies of insurance owned by and in the name of his father, Jim Lightner (Jim).[1] Identical language in each policy defined the term "insured" in Part I (Liability Coverage) in this manner:

"The unqualified word 'insured' includes . . . with respect to the described automobile . . . the named insured . . ."

The term "insured" in Part II (Uninsured Motorist Coverage) was defined in these words:

"Insured means . . . the named insured or a relative, . . ."

These sections indicate that plaintiff, as an unemancipated minor living at home with his parents at the time of the accident, would be provided uninsured motorist protection by those policies.

However, "relative" was defined in the "Additional Definitions" section (Part I) as follows:

"[r]elative means a relative of the named insured who is a resident of the same household, provided neither *such relative* nor his spouse *owns* an automobile." (Emphasis added.)

Thus, the coverage question centers on the meaning of the term "owns" in the referenced definitional section.

The parties filed a stipulation in which Farmers admitted that under the truck policy (No. 754), plaintiff was an insured. It was further stipulated that whether he was insured under the motor home (No. 324) and the car (No. 396) policies was "an issue of law for determination by the Court."

At the close of the evidence, plaintiff's motion for directed verdict was sustained on the question of law and the court held that within the meaning of the term "owner" in the questioned policies, plaintiff was not an owner of the 1979 Chevrolet truck. Hence, plaintiff was permitted to stack coverage of the three policies.

The stipulation further provided that "the only issues of fact for determination by the jury are the nature, extent and consequences of Tim Lightner's injuries and the size of the sum that will fairly and justly compensate him therefor." This fact issue was so submitted and the jury re-

1. The three policies were as follows:

| Policy Number | Uninsured Coverage for Each Person | Insured Vehicle |
|---|---|---|
| 754 | $100,000 Uninsured | 1979 Chevrolet truck |

| Policy Number | Coverage for Each Person | Insured Vehicle |
|---|---|---|
| 396 | $100,000 | 1981 Chevrolet Citation |
| 324 | $100,000 | 1976 motor home |

The uninsured motorist coverage in each policy was by endorsement extended to *underinsured motorists.*

turned its verdict for $250,000, reduced by the Court to $225,000 after crediting the $25,000 received from Gaba's liability insurer. Subsequently, Farmers paid $75,-000 under policy No. 754 and received partial satisfaction of the judgment in that amount.

As previously noted, three vehicles owned by Jim were used by the Lightner family during September 1982, and though Jim had added the name of his minor son, Tim, to the certificate of title for the truck, the court entered its order finding that Jim Lightner, not Tim, was the owner of the truck within the meaning of the car and motor home policies. It is this finding which led to the permitted stacking that Farmers challenges on appeal. In sum, Farmers' only demurral to stacking coverage of the three policies is the restrictive language in the definitional section of the truck policy.

Jim Lightner is the only witness whose testimony has been provided in the record before us. He testified that he was looking for a vehicle that his son "could use for his purposes" and, on finding the Chevrolet truck which he and his son liked, Jim promptly bought it. He then called the Farmers agent, who sold the policies on the other Lightner vehicles, and told him, "I bought a Chevy pickup and I need insurance for it." He explained that Tim would be the primary driver of this vehicle and, pursuant to that conversation, the policy was issued to Jim as the named insured. Though he added Tim's name to the certificate of title, Jim testified he did so because he wanted the truck to go to Tim if "something happened" to him. Clearly, though he intended in the event of his death or other misadventure the truck would become Tim's, "[he] felt [he] owned the truck." Further, Jim had agreed his son could buy the truck at a later time when Tim was able to pay for it. Following the purchase of the truck in February 1982, nothing in the record demonstrates that Tim thereafter bought the truck or made an effort to change the title or convert the insurance to his name alone. Sometime after Tim was injured in September 1982, the truck was damaged so extensively it was declared a total loss and the insurance proceeds were paid to Jim.

The term "owns," not separately defined in the policy, must be interpreted in light of the special circumstances here. Plaintiff argues we must take the meaning most favorable to the insured, that under these facts the trial court's findings are supported by substantial credible evidence, and further, that Jim, as the named insured on all policies, could reasonably expect his family would enjoy complete coverage. Finally, plaintiff argues that the risk insured by Farmers is not increased by affirming the trial court's finding that Tim *was not* the owner of the Chevrolet truck for purposes of these policies because Farmers issued the insurance believing Jim Lightner *was* the owner of the truck and only after the accident did it complain Tim's name had been added to the certificate of title.

Our standard of review on this court-tried issue is governed by the teachings of *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment will be sustained unless there is no substantial evidence to support it or it is against the weight of the evidence; seldom should a judgment be set aside on the ground that it is against the weight of the evidence, and then only with caution and a firm belief that it is wrong. *Id.* at 32. On this record, we cannot say there is no substantial evidence to support the judgment.

The term "owner" is described in *Black's Law Dictionary*, 996 (5th ed. 1979), as:

"the person in whom is vested the ownership, dominion, or title of property, who has dominion of a thing ... which he has the right to enjoy and do with as he pleases, even to spoil or destroy it so far as the law permits ..." The term is, however, a *nomen generalissimum*, and its meaning is to be gathered from the connection in which it is used and from the subject matter to which it is applied...."

In 67 C.J.S. *Own* (1978), "own" is defined:

The word "own" is a general term which varies in its significance according to its use. It has been said that the words

indicating qualified or absolute ownership, depends on the subject matter and the circumstances surrounding the subject matter and the parties.

Defendant makes much of the fact the father added his son's name to the certificate of title, but, as stated in *Case v. Universal Underwriters Insurance Company*, 534 S.W.2d 635 (Mo.App.1976), "the Missouri courts have held that a certificate of title is only prima facie evidence of ownership which may be rebutted." *Id.* at 639. In *United States Fidelity and Guarantee Company v. Safeco Insurance Company of America*, 522 S.W.2d 809 (Mo. banc 1975), this Court observed that " 'owner' ... is a word of rather broad meaning," and in construing the term courts must take the meaning most favorable to the insured. *Id.* at 817–818. The presence of Tim's name on the title is not the single controlling factor as Farmers insists. Our Court has long held that policyholders are entitled to a favorable interpretation of the term "relative" in such contracts, and that coverage be provided where reasonably possible. *See Cobb v. State Security Insurance Co.*, 576 S.W.2d 726, 737 (Mo. banc 1979). In *U.S.F.G. v. Safeco, supra,* the issue was whether the daughter's friend was a permissive user under provisions of an automobile policy and the court, considering the term "owner," noted that the term was general in nature, and capable of various meanings depending on the situation involved. *Id.* at 817–818. The cases differ depending on the context in which the term is employed; e.g., Chapter 301, Registration and Licensing of Motor Vehicles, or in construing a variety of insurance provisions running the gamut from liability protection to uninsured motorist coverage. In the latter setting, the term is used to restrict coverage, and accordingly it must take the meaning most favorable to the insured. Though Tim was permitted to drive the car and have its general use with little or no controls, nothing in the evidence indicates this was done other than with the permission of his father, and it cannot seriously be suggested he was free to voluntarily destroy, encumber, sell, or otherwise dispose of the truck. Indeed, the truck was not to be his until he bought it or until "something happened" (i.e. death) to the father. From this, it may reasonably be inferred the father could, at his pleasure, withdraw the permission to drive the truck, which does little to bespeak ownership in Tim.

Defendant mistakenly asserts that the court in *Famuliner v. Farmers Insurance Co.*, 619 S.W.2d 894 (Mo.App.1981), specifically addressed the issue of whether the name on a certificate of title is dispositive of the issue of ownership within the meaning of an insurance policy. In that case, it was undisputed that plaintiff was the *owner* of an automobile, a motorcycle and insurance policies, which disqualified him from stacking uninsured motorist coverages of his parents' automobile policies. *Id.* at 896. Here, plaintiff had no automobile of "his own."

An additional consideration supporting the trial court's judgment is that in adhesion contracts such as this insurance policy, its terms should be construed to give effect to the objective and reasonable expectations of the insured or the beneficiary, *Spychalski v. MFA Life Insurance Company*, 620 S.W.2d 388, 396 (Mo.App.1981), and its language is to be viewed in the light that would ordinarily be understood by laymen who purchased the policy. *McRaven v. F–Stop Photo Labs, Inc.*, 660 S.W.2d 459, 462 (Mo.App.1983). The evidence justifies the conclusion that when Jim Lightner paid the premiums on the policies for the three vehicles he could reasonably expect his children living at home to be protected by those policies, and that the language "owns an automobile" which narrows the scope of the term "relatives" would not mean that an automobile owned by him, even though jointly titled with his child, would bar such coverage.

There was no uncertainty of risk. Farmers was aware that Jim Lightner had purchased the truck and that his son would be the primary driver.[2] The pertinent infor-

---

2. Though it appears from the testimony that Jim Lightner obtained the policy insuring the truck

mation necessary for evaluation of risk was disclosed prior to the issuance of the policy. On those facts, it assessed its position and made its determination of premiums charged. Farmers now seeks to escape its contractual responsibility under two of the three policies, having discovered, apparently sometime after the fact, that the father added the son's name to the certificate of title. The trial court properly concluded that Tim Lightner was entitled to the uninsured motorist coverage provided in all three policies. The judgment is affirmed.

BLACKMAR, C.J., HIGGINS, COVINGTON, BILLINGS, JJ., and CONNETT, Senior Judge, concur.

ROBERTSON, J., concurs in result.

HOLSTEIN, J., not sitting.

near or soon after the time of purchase, the company renewed the coverage for a second six-month period on September 16, 1982. This

was prior to plaintiff's accident and Farmers knew the risk.